ZACHARY, Judge.
*30 Respondent Mark Skinner ("Mr. Skinner") appeals from the trial court's order affirming an order entered by Wake County Assistant Clerk of Court Bill Burlington ("assistant clerk of court") removing Mr. Skinner as Trustee of the Cathleen Bass Skinner Special Needs Trust and as Guardian of the Estate (GOE) of Cathleen Bass Skinner. On appeal, Mr. Skinner argues that the order of the assistant clerk of court contains findings that are not supported by the evidence and certain conclusions that are legally erroneous. For the reasons discussed below, we agree.
I. Background
Cathleen Bass Skinner (Mrs. Skinner) suffers from cognitive and physical difficulties. On 13 April 2010, the assistant clerk of court adjudicated Mrs. Skinner to be "incompetent to a limited extent" and appointed "Wake County Human Services" as Mrs. Skinner's guardian. The order provided that Mr. Skinner could apply to become Mrs. Skinner's guardian in six months. Mrs. Skinner submitted a handwritten appeal from the clerk's order, asking that Mr. Skinner be appointed as her guardian. On 3 August 2010, Mrs. Skinner and Mr. Skinner were married, and on 4 August 2010, Mr. Skinner filed a motion to modify the guardianship order and appoint him as Mrs. Skinner's guardian. The parties to the motion included Mrs. Skinner, Mr. Skinner, Mrs. Skinner's Guardian ad Litem, Mary Easterling, Kathy Shelton,[1] and Wake County Human Services. On 20 January 2011, the assistant clerk of court entered a consent order appointing Mr. Skinner as the guardian of the person of Mrs. Skinner. On 27 August 2012, Mrs. Skinner's mother died, and on 23 August 2013, two of Mrs. Skinner's siblings filed a petition asking the assistant clerk of court to appoint Mrs. Skinner's sister Nancy Bass Clark (Mrs. Clark) as GOE for Mrs. Skinner.
The court appointed Kimberly Richards as temporary GAL for Mrs. Skinner, and Ms. Richards reviewed the files in this case and interviewed Mr. Skinner, Mrs. Skinner, and Mrs. Skinner's family members. Mrs. Skinner informed Ms. Richards that she wanted Mr. Skinner appointed as her GOE, while Mrs. Skinner's siblings preferred that Mrs. Clark be appointed. In her report to the assistant clerk of court, Ms. Richards stated that:
By all accounts, Mark Skinner has taken care of Cathy Bass Skinner for the past two years and her family has not been *31 actively involved in her life. It appeared *443 to me that Mark and Cathy care for each other and are actively involved in each other's lives. A family friend, Mary Easterling, reports that the couple is loving and happy.
On 9 October 2013, Mr. Skinner was appointed as the GOE of Mrs. Skinner, and on 5 December 2013, Mr. Skinner was bonded for $250,000. The GOE order, which found that Mrs. Skinner's inheritance was expected to be between $200,000 and $250,000, required that Mr. Skinner set up a Special Needs Trust for Mrs. Skinner. Accordingly, the Cathleen Bass Skinner Special Needs Trust was established and executed on 18 March 2014, and provided that Mr. Skinner would act as Trustee. On 25 March 2014, the assistant clerk of court entered an order approving the Trust and finding that the parties were "in agreement with the provisions of the Cathleen Bass Skinner Special Needs Trust," which included having Mr. Skinner serve as the Trustee of the Trust. The Trust was funded on 10 June 2014 with an initial distribution from the estate of $170,086.67. Shortly thereafter, Mr. Skinner used Trust assets to purchase a house where he and Mrs. Skinner live together, as well as some furniture and appliances.
On 28 July 2014, two of Mrs. Skinner's siblings filed a petition to remove Mr. Skinner as Trustee, on the grounds that Mr. Skinner had not complied with the Trust's requirement that Mr. Skinner provide Mrs. Clark with monthly bank statements. A hearing was conducted on 18 August 2014, at which the parties agreed that additional issues could be raised. On 27 August 2014, the assistant clerk of court entered an order removing Mr. Skinner both as GOE and as Trustee of the Cathleen Bass Skinner Special Needs Trust and replacing him with Mrs. Clark. Mr. Skinner appealed to the superior court of Wake County, and on 22 October 2014, the trial court entered a summary order affirming the assistant clerk of court's order. Mr. Skinner has appealed to this Court from the trial court's order.
II. Standard of Review
The assistant clerk of court removed Mr. Skinner as both GOE and as Trustee. N.C. Gen.Stat. § 35A-1290(a) (2015) gives the clerk of court the authority "to remove any guardian ... to appoint successor guardians, and to make rules or enter orders for the better management of estates and the better care and maintenance of wards and their dependents." Under N.C. Gen.Stat. § 35A-1290(b) (2015), it "is the clerk's duty to remove a guardian" if the guardian "wastes the ward's money or estate *32 or converts it to his own use," " mismanages the ward's estate," or "has violated a fiduciary duty through default or misconduct."
Regarding the clerk's authority to remove a trustee, N.C. Gen.Stat. § 36C-7-706(b) (2015) provides in relevant part that the clerk "may remove a trustee" if "(1) The trustee has committed a serious breach of trust" or "(3) Because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries[.]"
N.C. Gen.Stat. § 1-301.3 (2015) provides that a party aggrieved by an order of the clerk arising from the administration of trusts and estates may appeal to superior court, and that upon appeal:
[T]he judge of the superior court shall review the order or judgment of the clerk for the purpose of determining only the following: (1) Whether the findings of fact are supported by the evidence, (2) Whether the conclusions of law are supported by the findings of facts, [and] (3) Whether the order or judgment is consistent with the conclusions of law and applicable law.
Upon Mr. Skinner's appeal from the trial court's order affirming the order entered by the assistant clerk of court, this Court is called upon to review a non-jury proceeding. As a general rule:
The standard of review of a judgment rendered following a bench trial is "whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." "Findings of fact by the trial court in a non-jury trial are conclusive on appeal if there is evidence to support those findings. A trial court's conclusions *444 of law, however, are reviewable de novo. "
Gilbert v. Guilford County, 238 N.C.App. 54, 56, 767 S.E.2d 93, 95 (2014) (quoting Hanson v. Legasus of N.C., LLC, 205 N.C.App. 296, 299, 695 S.E.2d 499, 501 (2010) ). "If the court's findings of fact are supported by competent evidence, they are conclusive on appeal, even if there is contrary evidence." Collins v. Collins, --- N.C.App. ----, ----, 778 S.E.2d 854, 856 (2015) (citation omitted).
If the assistant clerk of court's findings are supported by the evidence and its conclusions of law are supported by the findings, then the clerk's decision on the appropriate action to take is reviewed for abuse of discretion.
*33 As the removal of a trustee is left to the discretion of the clerks of superior court ... our review is limited to determining whether the trial court abused its discretion. Under this standard, we accord "great deference" to the trial court, and its ruling may be reversed only upon a showing that its action was "manifestly unsupported by reason" or "so arbitrary that it could not have been the result of a reasoned decision."
In re Estate of Newton, 173 N.C.App. 530, 539, 619 S.E.2d 571, 576 (2005) (quoting White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) ). In determining whether there was an abuse of discretion, "[w]e may not substitute our own judgment for that of the trial court." Kinlaw v. Harris, 364 N.C. 528, 533, 702 S.E.2d 294, 297 (2010) (citing Worthington v. Bynum, 305 N.C. 478, 487, 290 S.E.2d 599, 605 (1982) ). Further, "[i]t is axiomatic that it is within a trial court's discretion to determine the weight and credibility that should be given to all evidence that is presented during the trial." Don't Do it Empire, LLC v. Tenntex, --- N.C.App. ----, ----, 782 S.E.2d 903, 910 (2016) (internal quotation omitted). Therefore, in our review of the order entered by the assistant clerk of court, we are neither "reweighing the evidence" nor "disregarding the deferential standard of review." Nor do we express any opinion on the merits of the clerk's determination that Mr. Skinner was no longer the best person to serve as GOE and as trustee, or on the clerk's assessment of the credibility and weight of evidence or his resolution of evidentiary inconsistencies.
However, "an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction." Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996). "[F]indings made under a misapprehension of law are not binding," and "[w]hen faced with such findings, the appellate court should remand the action for consideration of the evidence in its true legal light." Allen v. Rouse Toyota Jeep, Inc., 100 N.C.App. 737, 740, 398 S.E.2d 64, 65 (1990) (citing Dishman v. Dishman, 37 N.C.App. 543, 246 S.E.2d 819 (1978) (other citation omitted)). " 'While this Court is bound by the findings of fact made by the [trial court] if supported by evidence, it is not bound by that court's conclusions of law based on the facts found.' Accordingly, we review the trial court's conclusions of law de novo. " State v. Rhodes, 366 N.C. 532, 536, 743 S.E.2d 37, 39 (2013) (quoting State v. Wheeler, 249 N.C. 187, 192, 105 S.E.2d 615, 620 (1958) ). In sum, we review for abuse of discretion only those of the clerk's decisions that are based upon properly supported findings and legally correct conclusions:
*34 In the event that the result reached with respect to a particular issue is committed to the sound discretion of the trial court, appellate review is limited to determining whether the trial court abused that discretion. "A [trial] court by definition abuses its discretion when it makes an error of law." As a result ... the extent to which the trial court exercised its discretion on the basis of an incorrect understanding of the applicable law raises an issue of law subject to de novo review on appeal.
In re A.F., 231 N.C.App. 348, 352, 752 S.E.2d 245, 248 (2013) (quoting Koon, 518 U.S. at 100, 116 S.Ct. at 2047, 135 L.Ed.2d at 414, and citing Rhodes, 366 N.C. at 536, 743 S.E.2d at 39, and Falk Integrated Technologies, Inc. v. Stack, 132 N.C.App. 807, 809, 513 S.E.2d 572, 574 (1999) ).
In this case, although Mrs. Skinner's siblings filed the petition to remove Mr. Skinner as GOE and as Trustee, they did not present *445 any witnesses at the hearing. Instead, Mr. Skinner was the only witness who testified at the hearing, and accordingly Mr. Skinner's testimony was uncontradicted by any other witness. The assistant clerk of court was free to evaluate the credibility and weight of this evidence. In addition, the assistant clerk of court properly considered the extent, if any, to which Mr. Skinner's testimony was contradicted by the documentary evidence, such as the GOE order and the Trust instrument. However, the clerk's findings of fact necessarily had to be based on his assessment of the competent evidence. "[I]t is axiomatic that the arguments of counsel are not evidence." State v. Collins, 345 N.C. 170, 173, 478 S.E.2d 191, 193 (1996).
III. U.S.C. § 1396p(d)(4)(A) Trust-Introduction
The term "special needs trust" (SNT) refers generally to a trust created for the benefit of a disabled person in accordance with governmental and statutory regulations so that the disabled person maintains his or her eligibility for government benefits. There are several types of SNTs, each with different specific statutory and regulatory requirements in order to be effective.
The Cathleen Bass Skinner Special Needs Trust is a self-settled, sole benefit trust, established pursuant to 42 U.S.C. § 1396p(d)(4)(A) for the purpose of allowing Mrs. Skinner to enhance the quality of her life without jeopardizing her eligibility for Medicaid and Social Security (SSI) benefits. To be eligible for Medicaid and Social Security disability benefits, an individual's financial resources must be below a specified amount. U.S.C. § 1396p(d)(4)(A) states that the assets in a trust will not *35 count toward an applicant's available resources, provided that the trust has the following characteristics:
(A) A trust containing the assets of an individual under age 65 who is disabled ... and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under [ 42 U.S.C. § 1396 et seq. ].
Thus, a U.S.C. § 1396p(d)(4)(A) trust has three requirements:
1. It is established for the benefit of a beneficiary who is under 65 years old and is disabled.
2. The trust, despite the label "self-settled," must be established for the benefit of the beneficiary with the assets of the beneficiary by a third party such as the beneficiary's parent, a court, etc.
3. The trust must include a "payback" provision stating that upon the death of the beneficiary or the early termination of the trust the state will be reimbursed for the beneficiary's Medicaid expenditures before any other distribution may be made. Because a U.S.C. § 1396p(d)(4)(A) trust has a payback provision, it is not required to be administered in an "actuarially sound" manner whereby the entire trust is distributed during the beneficiary's lifetime.
In this case, there is no dispute that the Cathleen Bass Skinner Special Needs Trust meets the requirements set out in U.S.C. § 1396p(d)(4)(A).
IV. Purpose of U.S.C. § 1396p(d)(4)(A) trust
In Finding No. 10 of his order, the assistant clerk of court stated that the GOE order had directed establishment of a special needs trust "in order to preserve those assets for [Mrs. Skinner's] long term health needs." This is an error of fact and law.
First, the GOE order does not state that the purpose of the Trust is to provide for Mrs. Skinner's future medical needs. Thus, this finding is not supported by the evidence. In addition, because a special needs trust established under U.S.C. § 1396p(d)(4)(A) is, by definition, for the benefit of a person who is disabled and is receiving Medicaid benefits, *36 its purpose is not to save money for the person's future medical needs; rather, this type of trust is "intended to provide disabled individuals with necessities and comforts not covered by Medicaid" while maintaining Medicaid eligibility. Lewis v. Alexander, 685 F.3d 325, 331 (3rd Cir.2012), cert. denied, - *446 -- U.S. ----, 133 S.Ct. 933, 184 L.Ed.2d 724 (2013). Accordingly, § 2.03 of the Cathleen Bass Skinner Special Needs Trust bars the Trustee from using trust funds for "any property, services, benefits, or medical care otherwise available from any local, state, or federal governmental source[.]"
The Cathleen Bass Skinner Special Needs Trust, as a U.S.C. § 1396p(d)(4)(A) trust, states the following regarding its purpose:
This Irrevocable Trust is to enable [the] Beneficiary to qualify for (i) the Supplemental Security Income ("SSI") Program; (ii) medical assistance under the Medicaid program as provided for by Section 1396p(d)(4)(A) of Title 42 of the United States Code ... or (iii) any other governmental program.
In addition, § 1.04, Statement of Grantor's Intent, states that:
Grantor is creating this trust as a Means by which trust assets may be held for the sole benefit of ... [Mrs. Skinner] on the terms and conditions set forth in this instrument.
It is Grantor's intent to create a Special Needs Trust that conforms to North Carolina law.
This trust is created expressly for [the] Beneficiary's supplemental care, maintenance, support, and education, in addition to the benefits Beneficiary otherwise receives or may receive from ... any local, state or federal government, or from any private agency ... or from any private insurance Carriers covering Beneficiary.
It is Grantor's intent that the funding and administration of this trust will not subject Beneficiary to a period of ineligibility under Medicaid law pursuant to U.S.C. § 1396p(d)(4)(A) and North Carolina law....
Clearly the subject assets were not intended to be used for Mrs. Skinner's future medical needs, and in ruling otherwise, the assistant clerk of court made an error of law.
*37 V. Mr. Skinner's Duty to Provide Bank Statements
Two of Mrs. Skinner's siblings alleged that Mr. Skinner had failed to comply with the Trust's accounting requirement. § 5.04 of the Cathleen Bass Skinner Special Needs Trust provides that:
The Trustee shall cause monthly statements reflecting the current balance of the Trust's assets and all receipts, disbursements, and distributions made within the reporting period to be mailed to Beneficiary, Nancy Bass Clark (or to any successor appointed by Nancy Bass Clark), and to the Beneficiary's legal representative....
...
Failure to provide reports, statements or returns within seven (7) days after the date such report, statement or return was due or became available shall result in the disqualification of the Trustee....
The petition for Mr. Skinner's removal as Trustee alleged, not that Mr. Skinner had failed to provide bank statements, but that a recent bank statement indicated that Mr. Skinner had "us[ed] a debit transaction in order to obtain cash-thus hiding the purpose and entity to which Trust funds are being transferred." At the hearing, Mr. Skinner testified that when the Trust was first established he had no printed checks and therefore used cashier's checks to pay for several expenditures. The bank statement did not show the payee of the cashier's checks, so Mr. Skinner later provided Mrs. Clark with this information. Thus, it was undisputed that Mr. Skinner did send bank statements, but that he had used several cashier's checks that did not reveal the purpose for which the money was spent.
This evidence does not appear to establish that, as a matter of law, Mr. Skinner breached the trust's accounting requirement. However, we need not resolve this issue, given that the assistant clerk of court's order does not mention Mr. Skinner's compliance or lack of compliance with the accounting requirement. Had the assistant clerk of court found that Mr. Skinner breached the Trust's provision requiring accounting, we could review the clerk's findings and conclusions on this issue. However, the clerk made no such findings or conclusions and it is axiomatic that "[a]n appellate court does not weigh the evidence in order to make new findings[.]" Timmons v. North Carolina *447 DOT, 351 N.C. 177, 182, 522 S.E.2d 62, 65 (1999). *38 VI. Prepaid Burial Insurance
In Finding No. 24 of his order, the assistant clerk of court states that the "trust specifically states that funeral expenses are not permitted to be paid from the Trust prior to reimbursement to North Carolina (or any other state) for medical expenses." This finding is factually inaccurate. On the basis of this finding, the assistant clerk of court concludes in Conclusion of Law No. 4 that "Mr. Skinner's payment of $3,644.00 to Columbus Life for prepaid funeral expenses also is in contradiction to the terms of the Trust and in violation of his fiduciary duties as Trustee." This conclusion of law is in error.
A trust established under U.S.C. § 1396p(d)(4)(A), such as the Cathleen Bass Skinner Special Needs Trust, must provide for reimbursement of Medicaid payments upon the death of the beneficiary or early termination of the trust. Accordingly, Article Four of the Trust, "Administration of the Cathleen Bass Skinner Special Needs Trust upon Beneficiary's Death," provides in relevant part that:
Upon Beneficiary's death, the Trustee shall notify the appropriate state agency of Beneficiary's death and must promptly obtain an accounting from the states (or local Medicaid agencies of the states) that have made Medicaid payments on Beneficiary's behalf during her lifetime.
Upon receipt of such accounting, the Trustee will distribute all of the trust property as follows:
(i) first, the Trustee must reimburse the state as provided in Section 4.01, entitled "Reimbursement to State," below;
(ii) second, the Trustee may pay the expenses specified in Section 4.02, entitled "Payment of Expenses and Taxes," below[.] (emphasis added).
Section 4.01 requires the Trustee to repay to state or local Medicaid agencies "the lesser of" either the total amount of Medicaid benefits paid on Beneficiary's behalf during her lifetime, or "the entire balance of the Trust Estate." Section 4.02 states that upon "full reimbursement" to state and local Medicaid agencies, any funds remaining in the trust may be used for specified purposes, including "Beneficiary's funeral expenses." These "payback" provisions, which are required for a trust to comply with U.S.C. § 1396p(d)(4)(A), establish that upon termination of the trust, Medicaid is to be repaid first, even if this requires depletion of the entire trust.
*39 The requirement that, upon termination of the trust, the State must be reimbursed before any other distribution may be made is restated in Article Three, which addresses termination of the trust prior to the beneficiary's death. Section 3.04 of this article requires that, in the event of early termination of the Trust, "[t]he following expenses and payments are examples of some of the types [of payments] not permitted prior to reimbursement to North Carolina (or any other state) for medical assistance ... (iv) funeral expenses[.]" This section simply means that the order of payments upon termination is the same for both termination upon death of the beneficiary and for early termination.
These provisions serve the express purpose of ensuring that, upon termination of the Trust, Medicaid agencies are reimbursed before any other expenses, including funeral expenses, may be met with Trust funds. However, the provisions dealing with the order of repayment upon termination of the Trust do not govern the allowable expenditures during the Beneficiary's lifetime. The Trust does not bar the use of Trust funds to purchase a prepaid burial insurance policy. The assistant clerk of court's order cites no legal authority for the proposition that SNT funds cannot be used to purchase prepaid burial insurance. In fact, the expenditure was approved by the Medicaid provider prior to being purchased. The clerk made an error of law by failing to distinguish between the use of Trust funds for funeral expenses after termination of the Trust and use of Trust funds for purchase of prepaid funeral or burial insurance during the Beneficiary's lifetime.
*448 VII. Purchase of House, Appliances, and Furniture
A. Introduction
In the order removing Mr. Skinner as trustee, the assistant clerk of court made several findings relevant to the use of Trust assets to purchase a home in which Mrs. Skinner and Mr. Skinner were living at the time of the hearing:
21. Mr. Skinner also used the Trust assets to purchase a house (Wake Co. Deed Book 014713, Page 01402-06), new furniture, [and] new appliances[.]
22. Mr. Skinner resides with [Mrs. Skinner] in the house purchased by the Trust and he benefits from the Trust purchases and expenditures relating to the house.
23. The terms of the Trust require that the Trust assets be used for [Mrs. Skinner's] sole benefit.
*40 The assistant clerk of court reached the following conclusions of law that appear to be related to Mr. Skinner's use of Trust funds to purchase a house, furniture, and appliances for Mrs. Skinner:
5. A Trustee is required, among other things, to administer a trust as a prudent person would by considering the purposes, terms, distributional requirements, and other circumstances of the trust in the exercise of reasonable care, skill, and caution.
6. Mr. Skinner has demonstrated that he lacks appropriate judgment and prudence.
7. Mr. Skinner is in breach of his fiduciary duties pursuant to the terms of the Trust, the terms of the GOE Order, and applicable law.
8. Mr. Skinner has wasted the Trust assets, mismanaged the Trust assets, and converted the Trust's assets to his own use. [ (the conclusion regarding conversion arises from Mr. Skinner's use of trust funds to pay certain attorneys' fees, as discussed below) ].
The assistant clerk of court's rulings reflect the clerk's conclusions that (1) the terms of the Trust did not permit the Trustee to use Trust assets for the purpose of a house, furniture, or appliances; (2) the purchase of a house and furniture with Trust assets constituted waste and mismanagement of Trust assets; and (3) the fact that Mr. Skinner lived with Mrs. Skinner and presumably used the appliances and furniture was, as a matter of law, a violation of the requirement that the Trust be administered for the "sole benefit" of Mrs. Skinner. The first and third conclusions are errors of law, and the second is unsupported by any record evidence.
B. The Trust Permits the Purchase of a House, Furniture, and Appliances with Trust Assets
On appeal, Mr. Skinner argues that he did not violate the terms of the Trust or violate his fiduciary duty as a Trustee by using assets of the Trust to purchase a house, furniture, and appliances for the beneficiary. We agree.
The distribution of Trust funds is addressed in Article Two of the Trust, which states that:
*41 The Trustee will hold, manage, invest and reinvest the Trust Estate, and will pay or apply the income and principal of the Trust Estate in the following manner:
During Beneficiary's lifetime, the Trustee will pay from time to time such amounts from the Trust Funds for the satisfaction and benefit of [the] Beneficiary's Special Needs (as hereinafter defined), as the Trustee determines in the Trustee's discretion, as hereinafter provided....
Section 7.02(a) defines the term 'special needs' as the "Beneficiary's needs that are not covered or available from any local, state, or federal government, or any private agency, or any private insurance carrier covering Beneficiary."
In this case, the evidence indicates that Mr. Skinner authorized the following expenditures from Trust assets: (1) approximately $135,000 for the purchase of a house, which is titled to the Trust; and (2) between $3200 and $4500 for furniture, appliances, and repairs to the house. The uncontradicted evidence shows that the house, furnishings, and appliances are owned by the Trust; the house is handicapped accessible; the location of the house, which is close to where Mrs. Skinner previously lived, is helpful to Mrs. *449 Skinner, given her cognitive limitations; and the purchase of a house was something that Mrs. Skinner had wanted and that had improved the quality of her life. Therefore, as a general proposition, these expenditures were clearly within the Trust's definition of "special needs." The purchase of a house, furniture, and appliances fits squarely within the permissible uses of Trust assets under the terms of the Cathleen Bass Skinner Special Needs Trust. The assistant clerk of court erred as a matter of law by ruling otherwise.
C. No Evidence Suggests Trust Assets were Wasted
Mr. Skinner also argues that the assistant clerk of court erred by concluding that Mr. Skinner had failed to manage the trust in a prudent manner and that the Trust assets had been "wasted" and "mismanaged." We agree, and conclude that the clerk's findings and conclusions on this issue are unsupported by any record evidence.
Although some funds were spent on furniture and appliances for the house, the bulk of the Trust expenditure was the purchase of a handicapped accessible house, which is titled in the name of the Trust and in which Mrs. Skinner has an equitable ownership interest. Upon Mrs. Skinner's death, the house will be an asset of the Trust that could be sold and used to repay her Medicaid benefits. If the funds are needed prior *42 to Mrs. Skinner's death, the house may be sold at that time. Therefore, the money is not "gone" but has been invested in real estate, which is permitted under the Trust provisions. The wisdom of this investment is a separate question, but it is factually and legally inaccurate to state that the Trust assets were "wasted" or "depleted" in the absence of any findings regarding the wisdom of this particular investment.
The fact that the purchase of a house is authorized by the terms of the Trust does not necessarily mean that it was a wise investment. Under specific factual circumstances the purchase of a house might constitute an imprudent investment or a wasteful use of the assets of a trust. This might be the case if, for example, evidence were introduced showing that the house was in serious disrepair, was in a neighborhood with declining real estate values, was overpriced, or was inappropriately large or luxurious for the beneficiary's needs and circumstances.
However, in this case, the only evidence introduced on this subject indicates that the house was purchased for the relatively modest sum of $135,000, an amount which was less than its appraised value. There was no other evidence regarding whether the house was a prudent investment of the Trust assets. Nor was evidence introduced regarding the costs or savings attributable to Mrs. Skinner's living in her own house, with Mr. Skinner providing care for her at no charge. Therefore, the assistant clerk of court's conclusion that the purchase of a house, furniture, and appliances demonstrated Mr. Skinner's lack of prudence is unsupported by any record evidence and is therefore erroneous as a matter of law.
D. The Trust was Administered for the "Sole Benefit of Mrs. Skinner"
Mr. Skinner argues next that the assistant clerk of court erred by finding that because Mr. Skinner lived in the house with Mrs. Skinner, his wife, and presumably used the furniture and appliances, that Mr. Skinner "benefitted" from the purchase of a house and furniture. On this basis the assistant clerk of court concluded that these purchases violated the requirement that the Trust be administered for the "sole benefit" of Mrs. Skinner. In reaching this conclusion, the assistant clerk of court apparently employed a personal, colloquial definition of "benefits." Mr. Skinner contends that under the relevant Medicaid and Social Security regulations, and pursuant to the interpretation of these regulations by the Wake County agencies charged with administration of these programs, the clerk erred in its interpretation of the term "sole benefit." We agree and conclude that an examination of the relevant regulations in the context of trust common law and the common sense realities of *43 the life of any person, and especially of the challenges faced by a disabled person, makes it clear that the term "sole benefit" does not mean that a disabled person with a U.S.C. § 1396p(d)(4)(A) trust must live in a state of bizarre isolation in *450 which no other person may " benefit" from her house or furnishings.
In concluding that the Trust was not administered for Mrs. Skinner's sole benefit, the assistant clerk of court applied an informal or conversational definition of "benefits" as arising, not from the legal or financial effect of transactions involving Trust assets, but as depending instead on whether Mr. Skinner used or enjoyed-and thus "benefitted" from-the house, furniture, and appliances. The assistant clerk of court's ruling was not supported by citation to legal authority or by reference to any negative actions taken regarding Mrs. Skinner's receipt of Medicaid or SSI, such as suspending or decreasing Mrs. Skinner's benefits, and Mr. Skinner testified that he consulted with and had the approval of local aid agencies before making the purchase with trust funds.
The assistant clerk of court's interpretation of the legal term "sole benefits" would lead to an absurd result. Members of the general population are free to determine with whom to live and socialize, and how to entertain or otherwise interact with other people. Under the assistant clerk of court's interpretation of the requirement that a U.S.C. § 1396p(d)(4)(A) trust be administered for the "sole benefit" of the beneficiary, if a trustee uses the assets of a special needs trust to purchase items such as a handicapped accessible home, specially equipped car, or furniture, then the disabled beneficiary must either live alone or charge "rent" to her husband, who presumably must have his own separate furniture, washer and dryer, etc. The beneficiary of a U.S.C. § 1396p(d)(4)(A) trust could not allow another to drive or ride in her specially equipped car, to watch her TV, or have a visitor for supper, lest the other person's use of the dishes, enjoyment of a television program, or shared ride to a restaurant constitute a violation of the "sole benefit" rule. The clerk's interpretation is particularly absurd given the likelihood that a disabled person may need assistance from someone living in the home.
We wish to emphasize that in our analysis of this issue we do not consider the clerk's evaluation of the weight or credibility of any evidence, but only the clerk's ruling on the meaning of the legal term "sole benefit." It is long established that an appellate court should, when possible, avoid a statutory interpretation that yields an unjust or absurd result:
"The Court will not adopt an interpretation which resulted in injustice when the statute may reasonably be otherwise *44 consistently construed with the intent of the act. Obviously, the Court will, whenever possible, interpret a statute so as to avoid absurd consequences."
Nationwide Mut. Ins. Co. v. Mabe, 342 N.C. 482, 494, 467 S.E.2d 34, 41 (1996) (quoting Sutton v. Aetna Cas. & Sur. Co., 325 N.C. 259, 265, 382 S.E.2d 759, 763 (1989) ). Moreover, our review of the relevant statutes and regulations leads us to conclude that there is no indication that the legal conclusion reached by the assistant clerk of court correctly interpreted U.S.C. § 1396p(d)(4)(A), or that it comports with North Carolina trust law.
At the outset, we note that there appear to be no appellate cases in which a Court has held that the use of assets in a U.S.C. § 1396p(d)(4)(A) trust to purchase a house in which the beneficiary lives with his or her spouse or family members constitutes a per se violation of the sole benefit rule, without regard to the specific circumstances of the purchase. Given that Congress passed the legislation authorizing § 1396p(d)(4)(A) trusts in 1993, we believe that the absence of any cases that have applied the definition utilized by the assistant clerk of court indicates that the agencies charged with administration of Medicaid and Social Security have not taken the position espoused by the assistant clerk of court. Moreover, Mr. Skinner's uncontradicted testimony was that he had obtained the approval of the local administrators of Medicaid and Social Security prior to purchasing the house and other items.
Nor is the assistant clerk of court's position supported by the relevant regulations. The Social Security Administration (SSA) issues a Program Operations Manual System, known as POMS, that instructs SSA employees on the SSA's interpretation of U.S.C. § 1396p(d)(4)(A). "The POMS represent *451 ' the publicly available operating instructions for processing Social Security claims.' The Supreme Court has stated that '[w]hile these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect.' " Kelley v. Comm'r of Soc. Sec., 566 F.3d 347, 351 n. 7 (3rd Cir.2009) (quoting Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 385, 123 S.Ct. 1017, 1026, 154 L.Ed.2d 972, 986 (2003) ).
The Medicaid statute is complex, and the day-to-day application of the statute has been largely left to administrative agencies. Where that is the case, a court construing a statute will often look to the manner in which the administrative agencies have interpreted that statute, giving *45 deference to the construction placed on the statute by presumed experts in the field.
Hobbs v. Zenderman, 542 F.Supp.2d 1220, 1228 (D.N.M.2008) (citation omitted), aff'd, 579 F.3d 1171 (10th Cir.2009).
POMS Transmittal 48, SI 01120 TN 48, effective 15 May 2013, "modified [SSA's] policy on how to interpret the 'sole benefit' requirement for special needs and pooled trusts[,]" which includes a trust established under U.S.C. § 1396p(d)(4)(A). Transmittal 48 states in relevant part that:
2. Trust established for the sole benefit of an individual.
a. General rule regarding sole benefit of an individual.
Consider a trust established for the sole benefit of an individual if the trust benefits no one but that individual, whether at the time the trust is established or at any time for the remainder of the individual's life. Except as provided in SI 01120.201F.2.b. in this section and SI 01120.201F.2.c. in this section, do not consider a trust that provides for the trust corpus or income to be paid to or for a beneficiary other than the SSI applicant/recipient to be established for the sole benefit of the individual.
b. Exceptions to the sole benefit rule for third party payments. Consider the following disbursements or distributions to be for the sole benefit of the trust beneficiary:
Payments to a third party that result in the receipt of goods or services by the trust beneficiary[.] ...
The SSA's general definition of "sole benefit" is somewhat circular, as it defines a "sole benefit" trust as one that "benefits no one but that individual." The listed exception makes clear, however, that payment to a third party for a house, furniture, or appliances does not violate the sole benefit requirement. Similarly, the North Carolina Adult Medicaid Manual, in discussing the sole benefit requirement of a U.S.C. § 1396p(d)(4)(A) trust, states that "Sole benefit means that any real or personal property which is capable of being titled and is purchased by the trust must be titled solely in the name of the trust," exactly as was done in the present case.
Based upon a review of the regulatory definitions and the common law principles of trust law, the reasonable interpretation of the "sole benefit" rule for a U.S.C. § 1396p(d)(4)(A) trust is that:
*46 1. The trust must have no primary beneficiaries other than the disabled person for whom it is established.
2. The trust may not be used to effect uncompensated transfers or other sham transactions. For example, the sole benefit provision would be violated if the beneficiary's parents funded the trust with the assets of the beneficiary and then had the beneficiary give the money to her parents in a sham transaction.
3. The trust is one in which the trustee does not have a duty to balance the fiduciary benefit to the beneficiary with a duty to ensure that funds remain for creditors such as Medicaid or for contingent beneficiaries.
4. When trust assets are used for investments, the financial and legal benefit of these transactions must remain with the trust.
In this case, Mrs. Skinner is the only primary Beneficiary named in the Trust. The house purchased with Trust assets is titled in the name of the Trust. (Mrs. Skinner would be considered to be living in her own house based on her equitable ownership *452 of the residence.) The accrual of equity in the house or increase in the house's market value remains with the Trust, and thus is for Mrs. Skinner's legal benefit. The use of Trust assets to purchase a house, furniture, and appliances for Mrs. Skinner was an expenditure that resulted in her receiving goods. We conclude that the Cathleen Bass Skinner Special Needs Trust was established, and is being administered, for Mrs. Skinner's sole benefit. We have reached this conclusion without consideration of any aspect of this case that might implicate the weight or credibility of evidence, such as Mr. Skinner's testimony that Mrs. Skinner's parents wanted her to have a house. Instead, we have based our conclusion solely upon the undisputed terms of the Trust and the applicable jurisprudence.
VIII. Use of Trust Funds for Mr. Skinner's Attorneys' Fees
Section 5.03 of the Cathleen Bass Skinner Special Needs Trust states that:
The Trustee may retain and pay for attorneys ... and any other professional [s] required for Beneficiary's benefit in the discretion of the Trustee, subject to the limitations set forth in this trust.
*47 Specifically, the Trustee may pay for attorney fees and disbursements and court fees related to (i) any guardianship proceeding pertaining to Beneficiary ... and (ii) attorney fees related to the preparation, funding, maintenance, and administration of this trust.
(emphasis added). The record indicates that Mr. Skinner used Trust assets to reimburse himself for attorneys' fees incurred in connection with guardianship proceedings that took place prior to establishment of the Cathleen Bass Skinner Special Needs Trust. The assistant clerk of court concluded that the Trust funds could not properly be used to reimburse these attorneys' fees because the fees arose from the Mr. Skinner's research into whether he could legally marry Mrs. Skinner and the proceedings for him to be appointed as her guardian, rather than pursuant to guardianship proceedings occurring after Mr. Skinner was appointed Mrs. Skinner's guardian.
The relevant Trust provisions are ambiguous, in that they allow reimbursement for attorneys' fees "related to (i) any guardianship proceeding pertaining to Beneficiary" without specifying that this means "any guardianship proceeding pertaining to Beneficiary and that occurs after the trust is established. " N.C. Gen.Stat. § 36C-10-1006 provides that a "trustee who acts in reasonable reliance on the terms of the trust as expressed in a trust instrument is not liable for a breach of trust to the extent that the breach resulted from the reliance."
Moreover, assuming that it was a violation of the Trust's provisions for Mr. Skinner to use Trust assets for this purpose, the assistant clerk of court made no findings to support its implied conclusion that this error constitutes "a serious breach of trust" as opposed to an honest mistake. The Official Comment to N.C. Gen.Stat. § 36C-7-706 states that:
Subsection (b)(1) ... makes clear that not every breach of trust justifies removal of the trustee. The breach must be "serious." A serious breach of trust may consist of a single act that causes significant harm or involves flagrant misconduct. A serious breach of trust may also consist of a series of smaller breaches, none of which individually justify removal when considered alone, but which do so when considered together. (emphasis added).
In this case, Mr. Skinner's uncontradicted testimony was that he believed that he could use Trust funds to reimburse himself for attorneys' fees incurred in connection with the guardianship proceedings for *48 Mrs. Skinner, although the fees were incurred before he was named as GOE. In addition, the record indicates that he agreed to repay the Trust when this error was pointed out. This single error would not, standing alone, support a conclusion that Mr. Skinner had committed "a serious breach of trust."
IX. Conclusion
We conclude that we are not required to address Mr. Skinner's compliance with the Trust's accounting requirement, because it was not included in the assistant clerk of court's order. We further conclude that the clerk's order removing Mr. Skinner as GOE
*453 and Trustee was based upon several significant errors of law. The assistant clerk of court erred by concluding that the purpose of the Trust was to save money for Mrs. Skinner's future medical needs, and by holding that the Trust prohibited the use of Trust assets for prepaid burial insurance. In addition, the assistant clerk of court erred as a matter of law by ruling that the Trustee's use of Trust assets to purchase a house, furniture, and appliances violated the provisions of the Trust. The clerk's conclusion that these purchases were wasteful or imprudent was not supported by any evidence. The assistant clerk of court made another error of law by adopting a interpretation of the requirement that the Trust be for "the sole benefit" of Mrs. Skinner that is not supported by the pertinent regulations or citation to appellate authority. Finally, the order does not contain findings that would support the clerk's implied conclusion that Mr. Skinner engaged in a serious breach of trust by using Trust assets to pay for attorney's fees incurred for guardianship proceedings occurring prior to establishment of the Trust.
We agree with the dissent that an appellate court should not reweigh the evidence, second-guess the fact finder's determinations of the weight or credibility of the evidence, or substitute its judgment on a matter committed to the discretion of the trial court. We have adhered to these well-known principles, and there are no factual findings or discretionary decisions by the clerk that we have failed to respect. Nor are we suggesting that the assistant clerk of court's subjective judgment on the merits of Mr. Skinner as a GOE or Trustee was unreasonable. However, for the reasons discussed above, we conclude that the Order removing Mr. Skinner as Trustee of the Cathleen Bass Skinner Special Needs Trust and as GOE was based on several significant errors of law and must be reversed for application of the proper legal standards.
REVERSED.
Judge DILLON concurs.
Judge BRYANT dissents by separate opinion.

The record indicates that Mary Easterling and Kathy Shelton had each petitioned to be appointed as Mrs. Skinner's guardian, and that Mary Easterling was a "family friend." Both Easterling and Shelton consented to Mr. Skinner serving as Mrs. Skinner's guardian and agreed to withdraw their petitions for guardianship.